152 P.3d 544

James H. STEWART, Plaintiff–Appellant,

v.

Sarah P. STEWART, Defendant–
Respondent.

No. 31905.

Supreme Court of Idaho,
Boise, October 2006 Term.

Jan. 26, 2007.

Cosho Humphrey, LLP, Boise, for appellant. Stanley W. Welsh argued.

Bevis, Johnson & Thiry, PA, Boise, for respondent. James A. Bevis argued.

TROUT, Justice.

Dr. James Stewart (James) appeals from a magistrate court's division of community property and award of spousal support to his wife, Sarah Stewart (Sally). The case addresses the characterization of goodwill in a professional services corporation as community property in a divorce proceeding, together with an award of maintenance.

## I. FACTUAL AND PROCEDURAL BACKGROUND

James and Sally Stewart married in 1981. Two children were born into the marriage, both of whom are now of majority age. Sally helped put James through medical school and throughout the marriage cared for the children and worked as a teacher. The family moved several times before settling in Boise in 1995, where James joined Dr. Gerald Overly in a dermatology practice. In 1996, James and Dr. Overly formed the Dermatology Clinic of Idaho, P.A. (DCI). James is a forty-five percent shareholder in DCI and his practice includes general dermatological services and surgical procedures as well as a subspecialty in "MOHS" micrographic surgery, a method of removing certain skin cancers. Sally has continued to work as an elementary school teacher but, at the time of the divorce, reduced her schedule due her degenerative illness, post-polio syndrome.[1] The Stewarts own a residence with a stipulated value of $360,000. The personal property accumulated during the marriage includes the interest in DCI, retirement accounts, stock, automobiles, and furniture.

On April 23, 2003, James filed a complaint for divorce, and the matter proceeded to trial before a magistrate judge. The judge found James' dermatology practice to be valued at $130,554.00 in tangible assets. In addition, he found there to be $210,747.00 in professional goodwill associated with DCI separate and apart from James' skill. To the extent that this goodwill exceeded James' personal skill and knowledge, the magistrate judge concluded, this goodwill constituted community property subject to distribution.

The trial court awarded Sally an unequal division of the community property valued at $788,372.11, including the Stewart residence and various bank and retirement accounts. In light of the community property award, the magistrate judge calculated the level of spousal support necessary to support Sally to be $5,166 per month for twelve years. The

judge noted that Sally would not be eligible to receive Social Security until approximately twelve years from the date of the order, the same time she would become eligible to draw on her retirement accounts without penalty. The magistrate judge also considered Sally's post-polio condition, which at the time of the divorce had caused Sally to reduce her work schedule to 80% of full time.

James appealed the award, challenging the community property characterization of his businesses' professional goodwill; the amount of interest found in his medical practice; and the amount and duration of spousal support. The district court affirmed the valuation of the community interest in the medical practice, but vacated and remanded for further proceedings the award of spousal support because of a mathematical error in calculating the length of time maintenance should be paid. James appealed the district court's ruling to this Court; meanwhile, the magistrate court continued to hold proceedings on remand. The magistrate judge issued an order on remand noting the mathematical error in the spousal support calculation but concluding that the error made no difference in his determination of the overall spousal support award. After James appealed the magistrate judge's order on remand to the district court, this Court stayed all district court proceedings pending resolution of this appeal.

## II. STANDARD OF REVIEW

■■■ On appeal from a district court's appellate decision, this Court reviews the magistrate judge's decision independently from, but with due regard for, the district court's decision. *Antill v. Antill,* 127 Idaho 954, 957, 908 P.2d 1261, 1264 (1996). The trial court's findings of fact will not be set aside on appeal unless they are clearly erroneous such that they are not based upon substantial and competent evidence. *Reed v. Reed,* 137 Idaho 53, 56, 44 P.3d 1108, 1111 (2002); *Hunt v. Hunt,* 137 Idaho 18, 20, 43 P.3d 777, 779 (2002). When reviewing the

---

1. According to the magistrate's findings, Sally suffers from post-polio syndrome and a mild depression secondary to the disease. Post-polio syndrome emerges years after polio infection and its symptoms include muscle fatigue or atrophy causing pain and/or weakness. Post-polio syndrome is a progressive, degenerative disease for which there is currently no cure. In the future, Sally can expect to rely on a cane, brace, crutch, or wheelchair.

court's conclusions of law, however, this Court exercises free review of the trial court's decision. *Id.*

Disposition of property—including valuation and division—is a question of discretion, guided by statutory and case law. *Chandler v. Chandler*, 136 Idaho 246, 249, 32 P.3d 140, 143 (2001). "The disposition of community property is left to the discretion of the trial court, and unless there is evidence in the record to show an abuse of that discretion, the award of the trial court will not be disturbed." *Maslen v. Maslen*, 121 Idaho 85, 88, 822 P.2d 982, 985 (1991) (citing *Koontz v. Koontz*, 101 Idaho 51, 52, 607 P.2d 1325, 1326 (1980)). In "divorce proceedings the determination of the value of community property is within the discretion of the trial court and will not be disturbed on appeal if it is supported by substantial competent evidence." *Chandler*, 136 Idaho at 249, 32 P.3d at 143 (citing *Maslen*, 121 Idaho at 90, 822 P.2d at 987; *Shumway v. Shumway*, 106 Idaho 415, 679 P.2d 1133 (1984)); *Martsch v. Martsch*, 103 Idaho 142, 645 P.2d 882 (1982).

Review of a lower court's exercise of discretion is conducted under a three-tiered inquiry: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Chandler*, 136 Idaho at 249, 32 P.3d at 143 (citing *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989)); *Sun Valley Shopping Center, Inc. v. Idaho Power* Co., 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

Regarding spousal maintenance, this Court reviews the trial court's findings "that are the basis for the court's decision as to the duration and the amount of spousal maintenance to determine whether there exists substantial and competent evidence in support of these findings." *Chandler*, 136 Idaho at 249, 32 P.3d at 143 (citing *Wilson v. Wilson*, 131 Idaho 533, 535, 960 P.2d 1262, 1264 (1998); *Mulch v. Mulch*, 125 Idaho 93, 98, 867 P.2d 967, 972 (1994)). "The allowance of alimony and the amount thereof, are in the first instance committed to the trial court's discretion." *Nielsen v. Nielsen*, 87 Idaho 578, 585, 394 P.2d 625, 629 (1964).

## III. DISCUSSION

### A. Professional Goodwill

1. Characterization of professional goodwill

James disputes the magistrate judge's characterization of his portion of the professional goodwill in DCI as community property to be divided in a divorce. This Court has held that good will is an appropriate factor in determining the value of a business. *Olsen v. Olsen*, 125 Idaho 603, 606, 873 P.2d 857, 860 (1994). The goodwill of a business is "the custom which it attracts, and the benefits or advantage it receives from constant or habitual customers, and the probability that the old customers will continue to come to the place." *Harshbarger v. Eby*, 28 Idaho 753, 761, 156 P. 619, 621 (1916); *see also McAffee v. McAffee*, 132 Idaho 281, 286, 971 P.2d 734, 739 (1999).

The question presented by this case is whether goodwill is an appropriate factor to consider in determining the community property value of a professional services corporation, an issue of first impression. Any division of property in a divorce proceeding begins with the presumption that all property acquired after marriage is community property. *Reed*, 137 Idaho at 58, 44 P.3d at 1113. The trial court reasoned that James acquired all of his interest in DCI during marriage and that the value of his interest in DCI, including goodwill, was community property.

There seems to be no principled reason to treat the goodwill of a business differently when it is a professional services corporation. The property rights of individuals with professional educations and licenses do not differ from the rights of people engaged in other types of business. Determining the value of goodwill in small professional services corporations may indeed be difficult, since Idaho law treats personal skill and reputation as separate assets rather than community property. *See Wolford v. Wolford*, 117 Idaho 61,

67, 785 P.2d 625, 631 (1990) (holding that personal attributes, including knowledge, skill, and reputation, were not property, either separate or community); *Olsen*, 125 Idaho at 606, 873 P.2d at 860 (stating that knowledge, background, and talent are personal assets rather than community property). Where a professional business is an independent entity, however, goodwill is calculable and divisible in divorce just as goodwill in any other business. DCI was such an independent entity, and it was possible for the magistrate judge to distinguish between James' identity and the separate identity of DCI. A practitioner's knowledge, skill, and background are personal attributes. To the extent a professional services corporation has goodwill value beyond these personal assets, however, that goodwill is community property.

### 2. Valuation of professional goodwill

■ Applying a capitalized excess earnings analysis, the trial court found the net value of DCI's assets to be $290,120.00, of which $130,554.00 was community property, commensurate with James' 45% ownership in the practice. James alleges error in the magistrate judge's reliance on the capitalized excess earnings method to value James' interest in DCI's professional goodwill and on the data submitted by Sally's expert.

This Court reviews the magistrate judge's valuation under an abuse of discretion standard. As noted above, review of a lower court's exercise of discretion is conducted under a three-tiered inquiry: "(1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason." *Chandler*, 136 Idaho at 249, 32 P.3d at 143.

"The Court has repeatedly stated that the valuation of community property is within the discretion of the trial court." *Id.* Here, the magistrate judge correctly perceived that he had great discretion in weighing the strength and credibility of the evidence.

Under the second prong of the abuse of discretion inquiry, the magistrate judge was within the outer bounds of the law in relying upon the capitalized excess earnings method employed by Sally's expert. As the Court discussed in *Chandler*, there are many methods for assigning the goodwill value of a business, and "[h]ow the trial court assesses and weighs each method and variable with it, in each particular case, is within that court's discretion." 136 Idaho at 250, 32 P.3d at 144. As generally applied, the capitalized excess earnings method measures the value of a business "by multiplying the net excess earnings of the business by a predetermined capitalization rate to obtain a present value of the future income stream likely to be generated by the business." *Olsen*, 125 Idaho at 606, 873 P.2d at 860. James challenges the magistrate judge's citation to *Olsen* in his conclusion that the capitalized excess earnings method is "especially helpful in calculating the value of a business featuring the sales of services . . . ." James directs the Court to *Olsen's* express finding that the business in that case featuring the sale of services was not a professional service corporation. However, *Olsen* addresses professional services corporations only to specifically leave undecided any questions related to such corporations. The magistrate judge acted both within his discretion and within reason in relying upon the capitalized excess earnings method to value James' interest in his practice.

■ To satisfy the second prong and fall within the outer bounds of a judge's discretion, the magistrate judge's findings must also be supported by substantial and competent evidence. *Reed*, 137 Idaho at 56, 44 P.3d at 1111. A finding supported by substantial and competent, although conflicting, evidence will not be disturbed on appeal. *Id.* at 58, 44 P.3d at 1113. James claims error in the magistrate judge's decision to rely on data from Sally's expert when the magistrate judge acknowledged that the expert had misapplied the capitalized excess earnings method. The trial court noted that the expert should have considered both James' and Dr. Overly's incomes, expressed as a weighted average, and subtracted the comparative incomes of two practicing der-

matologists. Instead, the expert's analysis of goodwill focused only on James' practice.

The record reflects that the magistrate judge considered testimony from both parties' experts that DCI had goodwill and that James had an interest in that goodwill. In estimating James' interest in the goodwill of DCI, Sally's expert first calculated James' average income, weighted more heavily towards his most recent annual salary. The expert then compared James' average income with the average compensation of a doctor with the same specialty and in the same geographic region as James. In determining the average income of a local dermatologist, the expert consulted the 2001 Physician Compensation and Production Survey, published by the Medical Group Management Association and also relied on his own familiarity with the local market. Concluding that the appropriate income to compare to James' was $423,023.00—the average compensation for dermatologists in the ninetieth percentile of earnings nationwide—the expert then subtracted this number from James' average income to reach excess earnings. He then applied a capitalization rate of 22.1% to reach a goodwill value of $210,747.00. Importantly, in evaluating the accuracy of this number as a reflection of James' interest in DCI's goodwill, the magistrate judge made the factual findings that DCI's name, location, and reputation had value separate and apart from James' skill, and was designed to attract new patients not familiar with either James or Dr. Overly. The magistrate judge did not err in concluding that James' interest in DCI's goodwill totaled $210,747.00 and the record is sufficient to support the magistrate judge's findings.

## B. Maintenance award

James appeals the magistrate judge's award of spousal maintenance, arguing that it is premised on a mathematical error and is excessive given the division of community property. The magistrate judge awarded Sally spousal support of $5,166 per month until she reaches the age of 62, approximately 12 years from the date of the award. Sally's portion of the community property totaled $788,372.11. In determining the amount and duration of the maintenance award, the magistrate judge stated:

[Sally] will be awarded substantial retirement accounts that would incur penalties and taxes if liquidated. To maintain her reasonable needs, Sally would be forced to consume more than $50,000.00 per year, which would exhaust all of her assets and retirement in approximately 6 years.

This conclusion is premised on a mathematical error. In his order on remand, the magistrate judge acknowledged the error and amended his finding to show that without maintenance Sally would have twelve years, not six, before she would exhaust her resources. In the order on remand, the magistrate judge also noted that the mathematical error did not change his ultimate determination of the amount and duration of maintenance. Thus, the initial maintenance award remains unchanged. James has also appealed the magistrate judge's order on remand and that appeal is currently pending before the district court. In the ordinary course of proceeding, we would wait for the district court to render a decision on appeal before considering the order on remand. However, given the current posture of this case, it makes little sense to do that. Both Sally's and James' attorneys indicated during oral argument their mutual preference that this Court address the spousal maintenance award in light of the magistrate judge's order on remand. Therefore, we will consider the original award of maintenance, but also review it in light of the trial court's subsequent correction to his calculations and determination that it does not change the end result.

*Chandler's* three tiered abuse of discretion inquiry, applied above, is applicable as well to this Court's review of the award of spousal support. *See* 136 Idaho at 249, 32 P.3d at 143. As the magistrate judge correctly stated, the trial court's decision of whether to award spousal maintenance is discretionary and requires the court to give due consideration to each party's financial needs and abilities. *Ross v. Ross,* 103 Idaho 406, 411, 648 P.2d 1119, 1124 (1982). The remaining questions for this Court on review are whether the magistrate judge acted with-

in his discretion consistently with applicable legal principles, and whether he reached his decision through an exercise of reason.

Under I.C. § 32–705(1), the trial court may grant support where the spouse seeking the award has shown that he or she (a) lacks sufficient property to provide for his or her reasonable needs; and (b) is unable to support himself or herself through employment. "Reasonable needs," under Idaho law, account for the standard of living established during the marriage. *Wilson*, 131 Idaho at 536, 960 P.2d at 1265. Regarding the duration of the award, I.C. § 32–705(2) lists criteria for the court to consider, including the duration of the marriage; the age, physical condition, resources, and employability of the spouse seeking the award; the ability of the spouse from whom the award is sought to provide it; the fault of either party; and any tax consequences. The magistrate judge's findings reflect his reliance on these legal principles.

This Court "do[es] not expect mathematical precision in calculating to the dollar how much maintenance is required, nor must the record support a specific amount." *Wilson*, 131 Idaho at 536, 960 P.2d at 1265. The award must, however, be supported by substantial and competent evidence. *Reed*, 137 Idaho at 56, 44 P.3d at 1111. There is sufficient evidence to support the spousal maintenance award of $5,166.00 per month for twelve years.

James' annual income in 2002 was $511,390.00. The trial court found that James was in the prime of his career, and it was reasonable to assume that his earning capacity would remain at a similar or higher level for much of his career. In contrast, Sally's annual income for the year 2002 was $30,024.00. The magistrate judge found that Sally faces a progressing disability, that her ability to support herself is diminishing, and that the rate at which her health is declining is uncertain. Given James' dramatically different earning capacity (calculated to 25 times that of Sally by the magistrate judge) and given Sally's future ability to support herself—the only certainty of which is that it her ability will decline—the facts support an award of maintenance sufficient to provide

Sally not just minimal coverage but some sense of security.

Importantly, the trial court did not award spousal support indefinitely. Instead, he tied the length of his award—twelve years—to the age at which Sally will be eligible for Social Security and could withdraw money from her retirement accounts without penalty. The magistrate judge also took into consideration Sally's and James' monthly expenses, and considered the tax bracket into which Sally would likely fall.

The community property awarded to Sally does not render the amount of spousal support excessive. In *Hoskinson v. Hoskinson*, 139 Idaho 448, 80 P.3d 1049 (2003), we concluded that a magistrate judge did not err in denying maintenance to a 39–year–old wife in good health after a three year marriage, expecting her instead to meet her monthly expenses through a combination of employment, her share of her husband's retirement plan, and the equity in her house. *Id.* at 463, 80 P.3d at 1064. Notwithstanding our decision in *Hoskinson*, there is no requirement under Idaho law that a spouse fully exhaust all assets before an award of maintenance is appropriate. Sally's portion of the community property includes the value of the family's residence at $360,000.00 with a net equity value of $141,300.00. To convert her community property award into expendable assets, Sally would of course have to sell her house, which would in turn require her to purchase a new one. While the purchase of a much more modest home would allow Sally to capture the excess value from the sale of the family residence, the assumption that she must do so is inconsistent with providing Sally her reasonable needs as defined by the standard of living established during the marriage. It was reasonable for the magistrate judge to conclude that Sally should not have to relocate to a significantly less expensive house and make early, penalized withdrawals from her retirement accounts in order to maintain her standard of living.

The award of $5,166.00 for twelve years covers Sally's expenses for the twelve years before she is eligible for Social Security and can access her retirement accounts. After

that, Sally may support herself with her retirement accounts and any other assets she chooses to expend. The record supports the magistrate judge's findings that Sally lacks sufficient property to maintain her current standard of living and that she is unable to adequately support herself though employment. We conclude that the magistrate judge did not abuse his discretion in setting the amount and duration of the spousal support award.

## C. Attorneys Fees

 Sally requests attorneys fees on appeal under I.C. §§ 12–121 and 32–704. "Reasonable attorney's fees will only be awarded to the prevailing party under I.C. § 12–121 when the court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably and without foundation." *Balderson v. Balderson,* 127 Idaho 48, 54, 896 P.2d 956, 962 (1995) (internal quotations omitted). The previously unsettled state of the law on the characterization of professional goodwill makes an award of attorneys fees under § 12–121 inappropriate.

 Sally also requests fees under I.C. § 32–704. Under the statute, attorney fees may be awarded under original application to this Court. I.C. § 32–704; *Wilson,* 131 Idaho at 537, 960 P.2d at 1266. It is the policy of this Court, however, to leave the award of attorney fees to the trial court, "and to exercise its original jurisdiction only upon a showing that such action is necessary to the exercise of its appellate jurisdiction." Id. Sally has made no such showing. Sally's request for attorneys fees is therefore denied.

## IV. CONCLUSION

The magistrate judge's order calculating the value of the community's interest in DCI and awarding Sally an unequal division of the community property is affirmed, together with the award of spousal maintenance. We award costs but not attorney fees to Sally on appeal.

Chief Justice SCHROEDER and Judge SCHILLING, Pro Tem, CONCUR.

Justice EISMANN, Dissenting with respect to Part II.A and Concurring in Parts II.B and III.

Because the majority fails to distinguish between business good will, which is community property, and personal good will, which is not, I respectfully dissent.

The trial court found that the value of James's medical practice included a community asset labeled "goodwill," which the court valued at $210,747. In making that finding, the court relied upon the testimony of a certified public accountant (CPA) who was called by Sally. The CPA valued the goodwill by using the capitalization-of-excess-earnings approach. To do so, the CPA simply deducted an average annual income for dermatologists nationwide from James's average annual income for the last three years (giving extra weight to the last year) to obtain a figure labeled "excess earnings." The CPA then multiplied those excess earnings by a selected capitalization rate to produce the present value of receiving those excess earnings in the future. He labeled the value of that future income stream as being goodwill.

The issue is whether the capitalization-of-excess-earnings approach provides a value for a community asset that can be divided in a divorce where the spouse's income is derived from personally providing services to patients, clients, or customers. The excess earnings are in reality that portion of James's average annual income for a three-year period that exceeded the average annual income for dermatologists nationwide. It is simply his ability to earn above-average income. Assuming a bell curve distribution of annual income for dermatologists, approximately one-half would have excess earnings, and therefore goodwill, and one-half would not. The goodwill valued by using the capitalization-of-excess-earnings approach is the present value of James's ability to earn above-average income following the divorce. Thus, the question is simply whether a spouse's ability to earn above-average income after a divorce is community property.

A spouse's personal attributes, including knowledge, skill, reputation, background, and talent, are not community property, even if they were enhanced during the marriage. *Olsen v. Olsen*, 125 Idaho 603, 873 P.2d 857 (1994); *Wolford v. Wolford*, 117 Idaho 61, 785 P.2d 625 (1990). If James's ability to earn above-average income is based upon his personal attributes, then his ability to continue doing so after the divorce cannot be community property. For the present value of James's future "excess income" to be community property, his ability to earn above-average income during the marriage must have been based upon something other than his personal attributes.

In this case, the CPA had no idea whether James's ability to earn above-average income was based upon his personal attributes or upon some other factor. When asked what portion of James's excess earnings were based upon his personal knowledge, skill, and experience, the CPA answered, "To my knowledge, I do not think there has been a technique or a formula devised yet that does that."

The CPA assumed that all of the above-average income earned by James was derived from something other than his personal attributes. For that assumption to be valid, you must assume that the personal attributes of dermatologists, including their training, experience, competence, subspecialty, and reputation, have no bearing on their ability to earn income. All dermatologists would earn the same income if it were not for other external factors. In addition, you must assume that those other external factors are unique to the dermatologists' own practices and can be sold to another. In other words, market conditions or other similar external factors that are not unique to a particular dermatologist's practice have no impact on income. A strong economy in the city or region where the dermatologist's office is located would not have any impact on the dermatologist's income.

There was no evidence in the record supporting these assumptions, and they are contrary to common sense. The CPA's testimony does not support the assumption that external factors that are not unique to the dermatologist's own practice have no impact on income. He rejected the western states average when selecting an average income for dermatologists because of the impact that managed care had on dermatologists' incomes in California and Washington. In addition, the average income the CPA used was not the average income for dermatologists in Boise, or in the Treasure Valley, or even in Idaho. There was no evidence as to how James's annual income for the three-year period compared with the average annual income during that period for comparable dermatologists in Boise or the surrounding area. If his was equal to or lower than theirs, then there would be no goodwill using the CPA's methodology.

James is one of two dermatologists in Boise who have a subspecialty of micrographic surgery. The CPA did not take that subspecialty into consideration. In fact, he did not even know that James had that subspecialty. His calculations were based upon the assumption that all dermatologists have the identical earning capacity, and therefore a dermatologist's subspecialty would have no affect upon his earning capacity.

The CPA's opinion was based solely upon the capitalization-of-excess-earnings approach. He testified that he knew of only one dermatologist who sold his practice in Boise, but he was not familiar with the terms of the transaction. Thus, he would not know whether the sale included a figure for goodwill. The CPA stated he had also heard that there was a dermatologist in Boise who had been unable to · sell his practice and had simply referred his patients to another dermatologist. He also admitted that he did not know whether there was a market for dermatology practices in Boise.

The central error made by the CPA and the court was the failure to distinguish between personal goodwill and business goodwill. James's income derives from personally providing services to his patients. As a result, he has personal goodwill and possibly business goodwill. His personal goodwill comes from his personal attributes that attract patients or referrals and repeat business, including his training, experience, reputation, and patient satisfaction. The business

itself, Dermatology Clinic of Idaho, may also have business goodwill, based upon factors such as its location and reputation. The CPA's testimony upon which the magistrate relied did not distinguish between personal goodwill and business goodwill. In fact, he testified that he did not know of any way to separate out James's personal goodwill. James's personal goodwill is not community property. His personal attributes are not community property, *Olsen v. Olsen,* 125 Idaho 603, 873 P.2d 857 (1994); *Wolford v. Wolford,* 117 Idaho 61, 785 P.2d 625 (1990), and so his post-divorce ability to earn above-average income because of his personal attributes is not community property.

In a divorce action, a trial court must determine the value of community assets, including a community business. Value is "what a willing buyer would pay a willing seller for the business." *Chandler v. Chandler,* 136 Idaho 246, 250, 32 P.3d 140, 144 (2001). A willing buyer cannot purchase James's personal attributes. A willing buyer cannot purchase the relationship James has with his patients or their confidence in him. The CPA presented a hypothetical to explain how an inexperienced dermatologist who purchased James's practice could possibly be earning as much as James in four years. That hypothetical required James to work for the inexperienced dermatologist for one year after the sale in order to assist in the transition. During that year, James would be paid approximately 40% of his current income. The valuation of James's business at divorce cannot be based upon a requirement that he limit his post-divorce income in order to enhance the value of the community business. Any such requirement would simply amount to taking his post-divorce earnings, which are his separate property.

When professionals who personally provide services to patients, clients, or customers are ready to retire, change careers, or move to another area, they will often execute agreements not to compete when selling their businesses in order to increase the sale price of the business. They do so because they have personal goodwill, and the purchaser does not want to have to be in competition with them. When valuing a community business

in a divorce action, however, the court cannot assume that the spouse would execute a covenant not to compete, nor could the court require it. The spouse conducting the business is not retiring, changing careers, or moving to another area. Basing a valuation upon the assumption that there would be a noncompetition agreement, or that the spouse would continue working for the purchaser at a reduced income, would simply constitute taking the spouse's post-divorce income, which is separate property, in order to enhance of value of community property.

The business where James works is Dermatology Clinic of Idaho. The goodwill at issue is the goodwill of that entity. It is " 'the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence.... ' " *Chandler v. Chandler,* 136 Idaho 246, 250, 32 P.3d 140, 144 (2001) (quoting *Newark Morning Ledger Co. v. United States,* 507 U.S. 546, 555, 113 S.Ct. 1670, 1675, 123 L.Ed.2d 288, 299 (1993)). The relevant common celebrity and reputation for skill or affluence is that of Dermatology Clinic of Idaho, not James. Certainly, business entities providing professional services to patients or clients can have goodwill that is independent of the professionals who actually provide those services. The longer the entity has been in business and the higher the number of professionals working in it, the greater the likelihood it will have business goodwill. In this case, however, there is no evidence showing the value, if any, of the business goodwill of Dermatology Clinic of Idaho.

Even the CPA's hypothetical used to illustrate his opinion showed that he was including James's personal goodwill in the valuation of the business goodwill. If he had been valuing only the business goodwill, a qualified dermatologist could take James's place and there would be little or no change in the business income. Patients would still keep coming because of the good name or location of Dermatology Clinic of Idaho regardless of whether James was there. The CPA's hypothetical assumes that would not occur. Otherwise, there would be no need for James to

work there for a year at a substantially reduced salary in order to assist in the transition and there is no reason why it would take four years or more for the new dermatologist to be earning the same income as James.

The CPA used the figure of $423,023 as James's average annual income, and assumed that he would work for $200,000 for one year to help in the transition after the sale. By doing so, he would be able to receive $210,747 for "good will." Thus, by giving up $223,023 in salary James could receive $210,747 for good will. Such a deal!

The method used by the CPA in this case would apply to any person whose income was derived from the rendition of personal services. When applied to attorneys, the assumption would be that all attorneys have the same income-earning ability. Their differences in income are based solely upon external factors that do not include their training, experience, ability, intellect, or skill. If the method is valid for professionals who provide services to their patients or clients, it is also valid for blue-collar workers who provide services to their customers. If, for example, an electrician earns an above-average income, the electrician would have goodwill that could be sold, even though the person purchasing the electrician's business may receive only the electrician's tool belt and tools. The assumption would be that an electrician earning a below-average income need only strap on that tool belt to begin earning an above-average income.

I would vacate the magistrate judge's valuation of the community's interest in Dermatology Clinic of Idaho and remand for further proceedings consistent with the above. If such revaluation results in a significant reduction in the value of the community property awarded to Sally, I would also permit the magistrate to re-evaluate the amount of spousal support.

Justice JONES Concurring in Parts IIIA, IIIC, and IV, and Concurring in the result of Part IIIB.

The Court's treatment of the issue of professional goodwill is right on point. James had urged that the Court make a distinction between the personal goodwill of his professional practice and the "enterprise" or professional goodwill of the business. In my view, the goodwill of a business, whether professional or otherwise, if it exists and is properly characterized as community property, is subject to division upon divorce. With regard to the maintenance award, I would not disturb the result reached by the trial court but do think two matters raised on appeal by James should be addressed.

With regard to the goodwill issue, the Court was correct in declining James' invitation to draw a distinction between enterprise goodwill and personal goodwill when considering the value of his business. In urging the adoption of this distinction, James called our attention to *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003), wherein the West Virginia Supreme Court asserted "there are two types of goodwill recognized by courts in divorce litigation: enterprise goodwill (also called commercial or professional goodwill) and personal goodwill (also called professional goodwill)." *Id.* at 541. Before one jumps to the conclusion that both types of goodwill are one and the same, i.e. professional goodwill, the West Virginia Supreme Court went on to say:

> 'Enterprise goodwill attaches to a business entity and is associated separately from the reputation of the owners. Product names, business locations, and skilled labor forces are common examples of enterprise goodwill. The asset has a determinable value because the enterprise goodwill of an ongoing business will transfer upon sale of the business to a willing buyer.'

> \* \* \*

> '[P]ersonal goodwill is associated with the individuals. It is that part of increased earning capacity that results from the reputation, knowledge and skills of individual people. Accordingly, the goodwill of a service business, such as a professional practice, consists largely of personal goodwill.'

*Id.* at 541–2. James would have the Court enter the morass of trying to draw a distinction between the value attributable to a professional practice by virtue of the individual

attributes of the professional and the value of goodwill not attributable to those personal assets, valuing each separately, and then dividing the latter but not the former. Quite frankly, such an approach does not make a good deal of sense.

Some businesses, regardless of whether they are professional practices, retail businesses, or manufacturing operations, will have more value than a competitive business because of the energy, good sense, and other personal attributes of the person or persons operating them, as compared to the competitor. When valuing service businesses, such as restaurants, retail sales operations, and the like, an income approach is often employed. A business that provides exceptional service will often produce a greater income, and larger income approach valuation, than one which does not. The value created by extra effort, skill, and attention to detail is comparable to the value created by the personal attributes that a successful professional adds as goodwill in his or her professional practice. We have held that special attributes of a proprietor, adding to the value of a restaurant business, can be goodwill to be considered in establishing the business value for purposes of division of community property. *Chandler v. Chandler*, 136 Idaho 246, 32 P.3d 140 (2001). There is no reason why value added to a professional practice by virtue of the personal attributes of the professional practitioner cannot also be treated in such fashion.

While the professional attributes and skills of the marital partners are not community property, the employment of those attributes and skills during the course of the marriage can produce value in a business, whether professional or otherwise, that becomes community property. *Wolford v. Wolford*, 117 Idaho 61, 785 P.2d 625 (1990) tells us that personal attributes, including knowledge, background and talent, are not in themselves community property. *Id.* at 67, 785 P.2d at 631. However, *Wolford* also says that "Personal attributes can enhance income which ... is community property ..." *Id.* Personal attributes can also enhance the value of a business, including a professional practice, thus creating value that is community prop-

erty. We don't shrink back from considering a spouse's earning capacity, based upon knowledge, background and talent, in determining the amount of future spousal maintenance, where such an award is appropriate, nor in considering how much that spouse must contribute to the support of minor children. Neither should we ignore the value of goodwill built up by a spouse in a business or professional practice during the course of the marriage because that value is a present value that can be allocated between the parties. It is not an allocation of future earnings. Rather, it is a calculation of what the business or professional practice might be worth on the market, based upon expert evidence presented by one knowledgeable in calculating such value.

In this case, Sally's expert presented credible testimony regarding valuation of the goodwill built up in James' professional practice during the course of the marriage. James' expert sought to call the methodology into question but did not offer any testimony regarding a different calculation of the value. The trial court, although identifying the methodology concern noted in the Court's opinion, wrote that the result produced by Sally's expert was "nevertheless reasonable because it was consistent with other resources and ... the best evidence in the record from which the court can fix the value of James' interest in DCI's goodwill." The Court properly affirms that result.

With regard to the issue of spousal maintenance, James argues on appeal that the trial court erred in two respects, neither of which is addressed in the Court's opinion. First, James contends that the trial court was incorrect in concluding that the retirement accounts awarded to Sally "would incur penalties and taxes if liquidated." Second, James contends that the trial court erred in failing to consider the income that Sally could earn on the cash assets awarded to her in the 12-year period in which the court ordered that maintenance payments be made. Both matters were obviously relevant to the spousal maintenance issue but there is no indication in the record as to whether James raised

either matter in the trial court proceedings.[2] A review of the record does disclose that James presented no evidence on either matter.

The trial court assumed that Sally would be subjected to penalties and taxes if she drew upon her "substantial retirement accounts" during the 12–year period she would receive spousal maintenance payments, until she reached early Social Security retirement age of 62. The judge did not identify which accounts he had in mind in reaching that conclusion. James points out that "the record is completely silent with regard to any penalties Sally would incur by withdrawing the funds she was awarded." That statement appears to be true. Neither party seems to have presented evidence as to the tax status of the accounts awarded to Sally, whether they were tax deferred accounts, and what consequences, if any, would result if any or all of the accounts were drawn upon by Sally before she reached age 62. It is not clear how the court reached the conclusion that penalties would be imposed if funds were withdrawn from some or all of the accounts prior to Sally reaching age 62. James contends the largest account, a Schwab One account with a balance of $446,920, was pre-taxed and that no penalty would result from making withdrawals prior to age 62. However, he cites to no evidence to support that contention. The reporter's transcript contains no evidence on the matter, nor do any of the exhibits before the Court. However, certain of the exhibits were not contained in the record before the Court and there is a possibility that some omitted exhibit may have a bearing on the matter. Two of the accounts, totaling $72,400, do appear to be IRA accounts, a fact the trial court may have judicially noticed in reaching its conclusion regarding the penalty issue.

The lack of evidence on the matter would tend to support the conclusion that the issue was not raised by James below. With an incomplete record, it would be inappropriate for this Court to speculate on the matter.

We will not assume error on appeal, rather the party asserting it must affirmatively show it. *Student Loan Fund of Idaho v. Duerner,* 131 Idaho 45, 54, 951 P.2d 1272, 1281 (1997). The trial court appears to have determined that the level of monthly maintenance ordered was appropriate, assuming that the accounts awarded to Sally remained intact during the 12 years leading to her attainment of the age of 62. Whether or not withdrawals from the accounts would or would not be subject to tax and penalties may therefore be irrelevant to the issue. Thus, although it is uncertain how the trial court reached its conclusion that there might be penalties imposed on withdrawals, the issue may be beside the point since the court set the level of support based on the assumption there would be no withdrawals from the accounts.

James contends, also, that the trial court should have considered the income Sally could have earned from the accounts awarded to her during the 12–year period until she reached the age of 62. James points out that she was awarded bank and investment accounts in the total amount of $788,372.11, which should have produced substantial income during the 12 years in question. This would undoubtedly have been a relevant consideration in the spousal maintenance inquiry, if it was raised below. James states that Sally's expert testified as to various tax-free rates of return that "Sally should be able to receive" from the accounts during the 12–year period. There is testimony in the record by Sally's expert regarding rates of return, but the testimony is more in the abstract and, particularly with regard to a period of up to 10 years, is more a guesstimate than an assertion of an available rate of return. The testimony was elicited by Sally's counsel, not the attorney representing James. Again, there is no indication that the issue was raised by James before the trial court and we are left to speculate on that. What is clear is that the trial court did not discuss it and James presented no evidence on it. It does not appear that the

2. In fairness, it should be noted that appellate counsel did not represent James at the trial court level.

matter was preserved for determination on appeal.

If one does not consider these two matters, it does not appear that the trial court abused its discretion in setting the amount and duration of the spousal maintenance payments. While I believe these two matters would have certainly been relevant, had they properly been raised below and preserved for appeal, it does not appear that they were raised below and therefore I concur in the result reached by the Court.